FILED

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

2007 NOV 26  P 5: 17

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

TYSONS TUNNEL INC.
1390 Chain Bridge Road
Suite 65
McLean VA 22101,

and

RATNER COMPANIES, LC
1577 Spring Hill Road, Suite 500,
Vienna, VA 22182,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, 400 7th Street SW. Washington,
DC 20590,

MARY E. PETERS, in her capacity as Secretary of
Transportation, 400 7th Street SW. Washington, DC
20590,

FEDERAL TRANSIT ADMINISTRATION, 400 7th
Street SW. Washington, DC 20590, and

JAMES S. SIMPSON, in his capacity as Administrator,
Federal Transit Administration, 400 7th Street SW.
Washington, DC 20590,

Defendants.

Civil No. 1:07CV1184
JCC/TRJ

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

Plaintiffs Tysons Tunnel Inc. and Ratner Companies, LC ("Plaintiffs"), on information

and belief, hereby avers and alleges as follows:

1.      This case arises from Defendants' consideration of the Dulles Corridor Metrorail Project ("Project"), which would extend the Washington region's Metrorail through Tysons Corner and Reston in Northern Virginia.

2.      The Project sponsor, Virginia Department of Rail and Public Transportation ("VDRPT"), has selected a Project design that calls for the rail line to be on an elevated track in the middle of Route 7 and Route 123 as they pass through the heart of Tysons Corner, the 12th largest central business district in the Nation and the only designated urban center in Fairfax County. The track will be 35 – 70 feet above the ground, effectively dividing Tysons Corner along Route 7. Moreover, construction of this elevated section will have severe traffic and economic impacts on Tysons Corner for the approximately 5-year period of construction due to the reconstruction of Routes 7 and 123.

3.      Tysons Tunnel Inc. ("Tysons Tunnel") and Ratner Companies, LC ("Ratner") (collectively "Plaintiffs") strongly support the extension of Metrorail through Tysons Corner to Dulles International Airport, but have concerns about the current aerial design through Tysons Corner. Plaintiff Tysons Tunnel and other interested parties have repeatedly urged Defendants and VDRPT to consider the alternative of building a tunnel under Tysons Corner – specifically, a tunnel using a large-bore tunneling method. Plaintiff Tysons Tunnel also has urged the Defendants to ensure compliance with federal competitive procurement requirements before allowing the project to proceed into final design.

4.      Defendants have an obligation, under the National Environmental Policy Act ("NEPA"), to consider all reasonable alternatives to the Project and to compare the environmental impacts of all reasonable alternatives to the preferred alternative. That comparison of reasonable alternatives is the heart of NEPA, because the environmental

consequences of a project are best understood by comparison of alternatives. NEPA further requires Defendants to carefully and accurately analyze the environmental impacts of the preferred alternative and all reasonable alternatives and to reconsider its environmental analysis when presented with new information that calls into question its prior analysis.

5.      The need to seriously and comprehensively consider reasonable alternatives to a major transportation project such as this one is so important that the Department of Transportation is prohibited from awarding federal funds to the proposed project if there are practical and feasible alternatives that would impose fewer environmental impacts. This restriction is established under 49 U.S.C. § 5324 and is separate from, and in addition to, the obligations of Defendants under NEPA.

6.      Despite these legal obligations, Defendants failed to consider the tunnel as a reasonable alternative to the aerial option even though they never concluded that the tunnel would fail to meet the Project's purpose and need, or would otherwise be unreasonable, impractical or infeasible to construct. Further, Defendants failed to treat the tunnel as a reasonable alternative even though they recognized that the tunnel would have fewer environmental impacts than the aerial alternative.

7.      Defendants ignored, or failed to fully consider substantial evidence demonstrating that a tunnel through the congested Tysons Corner area would (1) be of comparable cost to the elevated rail line studied, (2) impose fewer environmental and other impacts during construction, (3) impose fewer environmental and other impacts over the long-term, and (4) be feasible and practicable to build.

8.      Defendants' analysis also understates the environmental consequences of the aerial option by failing to accurately assess the construction impacts, including traffic, air quality,

cumulative impacts and land use impacts, as well as the long term visual, environmental and land use impacts of the elevated track.

9.      Defendants also violated 49 U.S.C. § 5324 by selecting the aerial alternative despite the fact that the tunnel alternative is a prudent and feasible alternative with fewer environmental impacts than the aerial alternative.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 because the claims asserted arise under the Constitution, laws or treaties of the United States. Specifically, the claims asserted herein arise under the Administrative Procedure Act ("APA"), 5 U.S.C. § 501 *et seq.*, National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and its implementing regulations, and laws relating to USDOT's approval of mass transit projects found in 49 U.S.C. § 5324.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because (1) a substantial part of the events or omissions giving rise to these claims arose in this judicial district and the Project will be built in this judicial district and (2) the Plaintiffs reside in this judicial district.

## THE PARTIES

12.     Tysons Tunnel Inc. is a non-partisan, not-for-profit Virginia corporation that represents the interests of civic organizations, businesses, homeowner associations, and private citizens that live, work, own or lease real property or have other business or personal interests within the Tysons Corner area of Fairfax County, Virginia.

13.     The purpose of Tysons Tunnel Inc. is to support the rapid, cost-effective completion of the Project while also ensuring that (1) a tunnel is fully considered for the Tysons

Corner portion of the Project, and (2) final design and construction work for the Project is subject to a competitive bidding process.

14.    Tysons Tunnel Inc. believes that the tunnel would provide the best long-term solution to the transit needs of the Project corridor while minimizing both long term environmental and other impacts as well as potentially severe traffic, environmental and economic impacts on Tysons Corner during construction.  Plaintiff Tysons Tunnel has gathered more than 18,000 signatures on a "Citizens Petition" endorsing these positions.

15.    Tysons Tunnel Inc. brings this action on behalf of itself and its adversely affected members and supporters.  Hundreds of individuals and business have joined or supported Tysons Tunnel.  Many of these individuals and entities live, work and/or make regular use of Tysons Corner in general and the Route 7 and Route 123 corridors in particular.  Many of these individuals own or lease property that would be adversely affected by construction of the Project using the aerial option.  Specifically, Tysons Tunnel and its members and supporters would be adversely affected by the construction and existence of the aerial option due to increased construction noise, pollution and disruption.  Similarly, they would be adversely affected by existence of the aerial option due to the visual and aesthetic blight the aerial option would create, and by the negative land use development patterns that a large aerial structure in the median of Route 7 would cause.

16.    Tysons Tunnel Inc., on behalf of itself and its members and supporters, has advocated for a tunnel through Tysons Corner and the use of competitive bidding for planning, design and construction of the Project.  Tysons Tunnel Inc. has organized numerous meetings, public information sessions and worked in numerous other ways to advocate this cause.

17.    Tysons Tunnel Inc. has hired engineers and other consultants to prepare preliminary engineering design documents, construction schedules, construction cost estimates, construction risk assessments and environmental analyses for the tunnel alternative. Tysons Tunnel has provided comments and information on the Project to USDOT, FTA, VDRPT, MWAA and other state and local agencies.

18.    Plaintiff Ratner is a Virginia limited liability company. Ratner has a long-term leasehold interest in its principal place of business at 1577 Spring Hill Road in Vienna, Virginia.

19.    Ratner's principal place of business is located at the intersection of Route 7 and Spring Hill Road, directly adjacent to the alignment of the aerial option and one of the above-ground station stops.

20.    Ratner will be adversely affected by the construction and existence of the aerial option due to increased construction noise, pollution and disruption. Similarly, Ratner will be adversely affected by existence of the aerial option due to the visual and aesthetic blight the aerial option would create, and by the negative land use development patterns that a large aerial structure in the median of Route 7 would cause.

21.    Ratner also employs approximately 200 people at its principal , all of whom will be adversely affected by the construction and existence of the aerial option due to increased construction noise, pollution and disruption. Similarly, Ratner's employees will be adversely affected by existence of the aerial option due to the visual and aesthetic blight the aerial option would create, and by the negative land use development patterns that a large aerial structure in the median of Route 7 would cause.

22.    Defendant USDOT is the executive department of the United States responsible, *inter alia*, for administering federal grant programs to promote the construction of mass transit

projects financed, at least in part, by federal funds.  As detailed below, USDOT has specific

statutory and regulatory obligations in connection with the Project.

23.     Defendant Mary E. Peters is the Secretary of Transportation.  As Secretary of

Transportation, Ms. Peters is responsible for the administration and operation of USDOT,

including USDOT's duties with respect to mass transit projects.  Ms. Peters is sued in her official

capacity only.

24.     Defendant FTA is part of USDOT with responsibility, through delegation and

otherwise, for administering USDOT's mass transit programs.  FTA has direct responsibility for

administering the New Starts program, which is the primary statutory mechanism by which

federal funds are used to support mass transit projects, and for otherwise ensuring that mass

transit projects are implemented in accordance with federal law, including NEPA.

25.     Defendant James S. Simpson is the Administrator of the FTA and is sued in his

official capacity only.

26.     Defendants USDOT, Peters, FTA and Simpson will be referred to collectively as

USDOT in this Complaint.

FACTS

**The Project**

27.     The Project involves a 23.1-mile extension of the 106-mile Metrorail system

serving Washington, D.C., and its suburbs.  The cost of the Project is estimated to exceed $4

billion.

28.     The Project is to be implemented in two phases.  Phase I is 11.6 miles long and

extends Metrorail from the existing Orange Line of the Metrorail system, just east of the West

Falls Church station, to Wiehle Avenue in Reston. Phase II is 11.5 miles long and extends from Wiehle Avenue to Route 772. Phase II would include service to Dulles International Airport.

29.    Phase I of the Project would serve the Tysons Corner area of Fairfax County. Tysons Corner is the 12th largest central business district in the Nation and the only designated urban center in Fairfax County. The 3.4-mile-long section of Phase I that is located within Tysons Corner is referred to in this Complaint as the "Tysons Corner Segment."

30.    Phase I includes four Metrorail stations in Tysons Corner, plus one at Wiehle Avenue. Approximately 66% of the riders in Phase I will use one of the Tysons Corner stations. When the full project is complete, total ridership in the four Tysons Corner stations will be approximately three times greater than ridership at Dulles Airport.

31.    The current plans for the Project call for construction of the Metrorail line on an aerial (overhead) structure for the majority of the Tysons Corner Segment. The piers for the aerial structure generally range from 35 to 70 feet in height, and would be located approximately every 60 to 100 feet along the aerial structure. Three of the four stations in the Tysons Corner Segment would be located on the aerial structure. One of the stations would be located partially below-ground and partially at-grade.

32.    Most portions of the Project other than the Tysons Corner Segment would be built at ground level in the median of the Dulles International Airport Access Highway.

**Project Organization**

33.    The Project is being developed by the Virginia Department of Rail and Public Transportation, an agency of the Virginia Department of Transportation ("VDRPT"). VDRPT is responsible for various functions involving the promotion, funding, and coordination of freight rail, passenger rail, and public transit systems in Virginia. VDRPT itself does not own or operate

any public transit system. VDRPT has applied to USDOT for federal funding and other approvals for the Project and currently is the Project Sponsor for purposes of federal law.

34.    VDRPT has chosen to develop the Project under the Virginia Public-Private Transportation Act, Va. Code § 55-556. *et seq.* ("PPTA"), which generally authorizes the Commonwealth of Virginia to use public-private partnerships to assist in the planning, development or construction of transportation projects.

35.    In June 2004 VDRPT entered into a Comprehensive Agreement with a private consortium, Dulles Transit Partners LLC ("DTP"), which included the preliminary engineering work for the Project. In April 2007, VDRPT announced that it had completed negotiations with DTP for the award of a design-build contract worth approximately $1.6 billion covering a portion of the work for Phase I of the Project.

36.    The negotiation of that design-build contract was done on a sole-source basis with DTP only. There was no competitive bidding or competitive negotiation for the design-build contract.

37.    Project plans call for VDRPT to transfer its function as Project Sponsor to the Metropolitan Washington Airports Authority ("MWAA") and then, upon completion of construction, for MWAA to transfer the Project to the Washington Metropolitan Area Transit Authority ("WMATA"), which would operate the Project as part of the Metro system. On information and belief, MWAA has already taken over several functions of project sponsor, including acting as lead negotiator with DTP for the design-build contract.

38.    Based on VDRPT's April 2006 preliminary financial plan, the estimated cost of Phase I of the Project (from the West Falls Church Metro station to Wiehle Avenue) of over $2 billion would be paid as follows: $900 million in federal funding under the New Starts program

(49 U.S.C. § 5309), which is administered by USDOT; $582.7 million from Fairfax County; $531 million from Dulles Toll Road revenues; and $51.7 million from Virginia Transportation Act of 2000 Funds.

39.     The bulk of Fairfax County's Phase I contribution, up to $400 million, will be supported by the Phase I Dulles Rail Transportation Improvement District ("Tax District"), which includes Tysons Corner. Revenues for the tax district are derived from a tax on commercial and industrial property owners within the district. The Tysons Corner area includes approximately 84% of the assessed value of the land within in the Tax District. Because the tax is based on assessed value, landowners in Tysons Corner will contribute 84% of the revenues to the Tax District.

**The Role Of USDOT**

40.     Because the Project is to be funded in part with federal funds, USDOT must fulfill certain statutory and regulatory obligations prior to awarding the federal funding grant. Because USDOT's decision is a major federal action, USDOT must carry out the environmental studies required under NEPA.

41.     In addition to complying with NEPA, USDOT must ensure that the Project meets applicable requirements of Title 49 of the U.S. Code, including the requirements for capital investment grants and loans ("New Starts") in 49 U.S.C. § 5309, the approval of the alternative with the fewest environmental impacts pursuant to 49 U.S.C. § 5324, and the competitive procurement requirement in 49 U.S.C. § 5325. The process of approving projects for grants under the New Starts program includes several major milestones, including: (1) alternatives analysis, (2) approval to enter preliminary engineering, (3) approval to enter final design, and (4) approval of a full funding grant agreement ("FFGA").

42.    In furtherance of its NEPA obligations, USDOT prepared an environmental impact statement ("EIS") and issued a Record of Decision and an Amended Record of Decision for the Project. The Final EIS was issued in December 2004, the Record of Decision was issued in March 2005, and the Amended Record of Decision was issued in November 2006. The Amended Record of Decision replaced the March 2005 Record of Decision. In the Amended Record of Decision, USDOT concluded that it had complied with its obligations under NEPA and 49 U.S.C. § 5324.

43.    On December 4, 2006, USDOT published a notice in the Federal Register announcing that the Amended Record of Decision is a "final agency action" that is subject to a 180-day statute of limitations under 23 U.S.C. § 139(l) ending on June 4, 2007.

### The Use Of Tunnels For Urban Mass Transit Systems

44.    The advantages of true subways are obvious. Large, noisy and obtrusive rail lines can be routed into the heart of urban areas with no visual or auditory disruption and without displacing other valuable land uses. Although elevated rail lines occupy less surface space than at-grade lines, the elevated roadway still displaces other uses and further divides neighborhoods by erecting a physical barrier.

45.    Traditional tunneling technology relied on the "cut-and-cover" technique in which a very large trench was dug, the tunnel built into the trench and then buried. Although the resulting subway line is buried, the construction impacts are significant.

46.    In recent years developments in tunneling machines have made it possible to bore tunnels with only minimal disruption to the surface. Early boring technology could drill relatively narrow tunnels, requiring separate tunnels for each track. Thus, a typical subway

required two tunnels, one for each direction of travel, with additional boring to accommodate stations and connector runnels.

47.    Today, larger tunnel boring machines allow the construction of large bore tunnels, wide enough to accommodate a subway line with two tracks, one for each direction of travel, and all underground stations in one, large diameter tunnel. This technique has been used in Europe and Asia and has been proven to be an efficient and effective way to build tunnels.

48.    Large-bore tunnels have two significant advantages over other tunneling techniques. First, unlike cut-and-cover tunnels, large bore tunnels do not require large scale disruption of the surface. Surface disruption is limited to areas where the design calls for access to the surface, such as stations, access tunnels and ventilation shafts.

49.    Second, older-technology tunnel boring machines would have to bore parallel tunnels for the two directions of travel, adding to the cost and duration of construction. Large-bore tunneling, by contrast, requires boring only a single tunnel wide enough for both tracks, stations and other underground facilities. The result is that large bore tunnels can be built with less expense and faster than narrow-bore tunnels.

50.    Despite the advantages of tunnels in general, and the wide use of large-bore tunneling technology in particular, the alternatives analysis conducted by USDOT for the Project has never included an in-depth examination of a tunnel alternative for the Tysons Corner Segment, and has not included any analysis of the large-bore tunnel concept.

**VDRPT's Selection Of The Aerial Alternative As The "Locally Preferred Alternative"**

51.    VDRPT's development of the Project began in December, 1998, when Raytheon Engineers and Constructors ("Raytheon") submitted an unsolicited conceptual proposal to VDRPT under the PPTA. The proposal involved an extension of Bus Rapid Transit ("BRT")

through the Dulles Corridor. Raytheon proposed a guaranteed fixed-price design-build-operate-maintain contract for the BRT system. Pursuant to the PPTA, VDRPT issued a Public Notice inviting competing proposals to be submitted within 30 days.

52.    Only Tysons-Dulles Corridor Group, a consortium led by Bechtel Corporation, submitted an alternative conceptual proposal within the 30-day notice period. This proposal involved construction of a rail line, not BRT, through the Dulles Corridor, and did not propose a guaranteed fixed-price design-build-operate-maintain contract.

53.    In August, 2000, after internal review of the two proposals, the Commonwealth Transportation Board approved the selection of the Raytheon proposal only. As approved, the Raytheon proposal included a rail option and would be structured as a single fixed-price contract for final design work, and then a separate contract – negotiated after final design was complete – for a fixed-price contract to build, operate, and maintain the project. Under the PPTA, further negotiations would be necessary before VDRPT would be committed to the Project

54.    In October 2000, Raytheon added to its team Bechtel, which had been part of the previously competing team of Tysons-Dulles Corridor Group, and formed a consortium known as DTP. Subsequently, Raytheon was acquired by Washington Group.

55.    In 2002, VDRPT selected the rail line with elevated tracks through the Tysons Corner Segment as the locally preferred alternative. VDRPT later redefined the locally preferred alternative to incorporate a two-phased construction sequence, as described above. This version of the Project continued to include the aerial section through the Tysons Corner Segment.

**Consideration Of A Tunnel Alternative During the NEPA Process**

56.    NEPA requires that an EIS analyze in detail all reasonable alternatives that could meet the project's purpose and need. That analysis requires that all reasonable alternatives be

developed to the same level of detail and that the environmental impacts of each alternative be analyzed in detail. This comparative analysis is the heart of the NEPA process.

57.     A reasonable alternative is an alternative that achieves the project's purpose and need and is practicable and feasible to construct. An alternative can be considered reasonable even if it is not as desirable as another alternative, is not as effective at meeting the purpose and need as other alternatives, or costs more than other alternatives. The purpose of an alternatives screening analysis is to identify reasonable alternatives that must be carried forward for detailed comparative analysis. If an alternative is considered unreasonable, the EIS must provide an explanation as to why it is unreasonable.

58.     The FEIS states that the alternatives screening analysis was designed to "carry forward those alternatives that were determined to best achieve" certain Project goals. By its own terms, this screening process was not designed to – and did not – distinguish between "reasonable" and "unreasonable" alternatives. Rather, it carried forward alternatives that were considered "better" and eliminated those that were considered less desirable. There was no determination that the eliminated alternatives were unreasonable.

59.     As part of its alternatives screening process, USDOT briefly considered and then eliminated two alternatives, known as Alignment T5 and Alignment T13, that would have included a tunnel through the Tysons Corner Segment. Both were rejected without detailed analysis. .

60.     Alignment T5 involved a "loop" through Tysons Corner, which was separate from the mainline of the Metrorail. Alignment T13 involved construction of the mainline directly through Tysons Corner. In both of these alternatives, all four Tysons Corner stations would be underground.

61.    Alignment T5 was considered in the "intermediate screening stage" prior to publication of the Draft EIS. The Final EIS explains that this alternative was rejected because "T5 would have fewer impacts, but much higher costs and greater risk of cost escalation due to extensive underground construction."

62.    Alignment T13 was considered after publication of the Draft EIS, in response to numerous public comments that urged additional consideration of a tunnel alternative. The Final EIS stated that Alignment T13 was rejected because it "[w]ould have much greater costs than Draft EIS alternatives, with no additional transportation service benefits" and "[r]eduction of visual and noise effects can be achieved through much lower cost mechanisms."

63.    Both T5 and T13 would have met the Project's purpose and need, been feasible and practicable to build and, as USDOT admitted, imposed fewer impacts than the aerial alternative. Both T5 and T13 were reasonable alternatives that should not have been rejected.

64.    Had USDOT investigated adequately the cost of constructing a tunnel it would have discovered that the cost of constructing a tunnel was comparable to the cost of the aerial alternative and that the risk of cost escalation due to underground construction was manageable through contract mechanisms.

65.    The visual and noise impacts of the aerial option cannot be mitigated to the same levels as the tunnel alternative.

66.    The *only* alternatives studied in detail in the Final EIS were the preferred alternative, including the aerial option in Tysons Corner, and the "No Build" alternative, which is required to be included in the NEPA analysis pursuant to regulations.

67.    USDOT did not conduct any investigation into the feasibility or cost-effectiveness of using large-bore tunneling technology on the Project. Neither the Addendum nor the Final

EIS addressed the potential to reduce the cost of tunneling by using a single, large-bore tunnel boring machine.

68.     Neither the Addendum nor the Final EIS concluded that a tunnel through Tysons Corner could not meet the Project's purpose and need, or was otherwise impracticable, infeasible or unreasonable.

69.     The Final EIS failed to adequately analyze the visual or noise effects of the aerial option. The analysis that was performed understated those impacts and incorrectly implied that these impacts could be easily mitigated.

70.     The Final EIS failed to adequately analyze the significant, multi-year traffic and economic impacts that would be caused by constructing an aerial structure along heavily traveled Route 123 and Route 7 through Tysons Corner.

71.     The Final EIS contained no comparison of the long-term operation and maintenance costs of the tunnel and aerial alternatives.

72.     The Final EIS contained no comparison of the life-cycle costs of the tunnel and aerial alternatives, in particular the potential cost savings over the life of the Project that would result from the much longer useful life of a tunnel.

**Proposals To Build A Tunnel Under Tysons Corner**

73.     In addition to its failure to independently investigate and fully analyze the tunnel alternative, including the use of large-bore tunneling technology, USDOT failed to include in its analysis information developed by others and made available to USDOT demonstrating that large-bore tunneling was a viable, reasonable alternative to the aerial option. Indeed, that information directly contradicted some of the key reasons USDOT cited for not considering the tunnel alternative further.

74.    In late 2005 and early 2006, while the EA was being prepared and was open for public comment, there were extensive discussions among several project partners – including at various times WMATA, VDRPT, DTP, and the Fairfax County Board of Supervisors – regarding the potential use of the large-bore tunnel method to construct a continuous tunnel through the Tysons Corner Segment.

75.    On March 15, 2006, Dragados and Clark Construction submitted to VDRPT an estimated cost for constructing a large-bore tunnel.  Clark Construction is a large, experienced construction company and Dragados is a major international construction company that has built tunnels and related facilities worldwide, including large-bore tunnels

76.    VDRPT asked DTP, the contractor with whom it was then negotiating a contract for the construction of the aerial alterantive, to analyze the Dragados-Clark estimate.  On March 20, 2006, DTP submitted a letter to VDRPT estimating that the *additional* cost of constructing the large-bore tunnel would be $823,878,673 in year-of-expenditure dollars.

77.    On March 24, 2006, WMATA sent a letter to VDRPT stating that DTP had "significantly overstated the cost difference" between the large-bore tunnel and the aerial structure.  WMATA estimated that the additional cost of building the tunnel would be "approximately $197 million not the $824 million which DTP has reported."  WMATA's estimate is also more than 50% lower than the estimate of the increased cost of the tunnel cited by USDOT when it rejected the tunnel alternative.

78.    USDOT was aware of, or should have been aware of, these letters and information.

79.    USDOT did not perform any analysis prior to issuing the Amended Record of Decision to reconcile these two cost estimates, despite an almost 400% variation, nor did

17

USDOT perform its own cost analysis to assess the reasonableness of the cost of the tunnel alternative.

### Additional Environmental Analysis

80.    After the Final EIS was approved and the (now-superseded) March 2005 Record of Decision was issued, USDOT re-opened the NEPA process to prepare an Environmental Assessment ("EA") assessing potential design refinements, some of which would have increased impacts and/or reduced benefits of the Project.

81.    The EA was issued in February 2006, a public hearing on the EA was held on March 28, 2006, and the public comment period was closed on April 11, 2006.

82.    Public comments on the EA requested further analysis of the tunnel option, specifically requesting that USDOT consider "advanced tunnel technology ... that could reduce costs" and urging an "independent review" of a tunnel through Tysons Corner.

83.    The EA did not include any analysis of a tunnel alternative through Tysons Corner. The EA did not mention the concept of a large-bore tunnel.

### The ASCE Panel Report

84.    On April 24, 2006, the Fairfax County Board of Supervisors unanimously approved a resolution requesting that the Commonwealth establish an independent peer review group to study the feasibility of a tunnel through Tysons Corner using large-bore tunneling technology.

85.    On April 28, 2006, VDRPT informed USDOT that the Secretary of Transportation of Virginia intended to convene a panel of independent experts to evaluate a "large-bore tunnel." In May 2006, the Secretary of Transportation of Virginia asked the American Society of Civil

Engineers ("ASCE") to convene an independent panel for the purpose of evaluating a large-bore tunnel through the Tysons Corner area.

86.     The ASCE report was publicly released in July 2006. The findings of the ASCE panel were favorable for the tunnel:

87.     The ASCE panel found that a large-bore tunnel would be feasible and listed numerous advantages of a tunnel, including fewer takings and lower right-of-way costs; less traffic disruption during construction; fewer utility relocations; longer useful life of a tunnel (120 years vs. 60 years); lower operating and maintenance costs; and other lower life-cycle costs.

88.     The ASCE panel estimated that the Project with a tunnel would cost approximately $2.50 billion, while the Project with the aerial design would cost approximately $2.25 billion (a difference of $250 million or approximately 11%).

89.     The ASCE panel also discussed "other cost issues," including life-cycle costs, operation and maintenance costs, right-of-way costs, utilities, and other factors. The panel concluded that, when these issues are considered, the large-bore tunnel would result in additional savings – specifically, $70 million savings in capital costs and $100 million savings in operations and maintenance. The $100 million reflected the net present value of an annual savings of $5 million. The panel also found that a tunnel would result in "greater positive long-term business and economic impacts" than the aerial alternative, but did not quantify this economic benefit.

90.     With the additional $170 million in savings considered under "other cost issues," the *net* additional cost of a tunnel according to the ASCE report would be approximately $80 million. This amount ($80 million) is approximately 10% of the amount calculated by DTP ($823 million) as the additional cost of a tunnel, and is approximately 20% of the $422 million additional cost cited by USDOT in its alternatives analysis.

91.     The ASCE panel report contradicted the earlier findings that had provided the basis for rejecting a tunnel alternative in the NEPA process. The ASCE panel report was widely disseminated and publicized. USDOT knew, or should have known, about the ASCE report prior to issuance of the Amended Record of Decision.

92.     The ASCE panel report also concluded that "the aerial alternative generates serious negative traffic and business access impacts during construction of stations and line along Route 7, alongside Route 123, and in the construction of the line over Interstate 495 (the Capital Beltway), concurrent with the HOT Lane construction on I-495. The large bore tunnel, because it presents much less surface construction activity, has a much smaller impact on vehicular and pedestrian traffic in these zones."

93.     Despite these findings by the ASCE panel, which directly contradict the grounds on which the tunnel alternatives had been eliminated from the alternatives analysis, USDOT did not reevaluate its previous analysis of the tunnel alternative, nor did it provide any opportunity for additional public review and comment on the tunnel alternative.

**Further Proposals To Build A Tunnel**

94.     During the development of the ASCE panel report, a group of international, national, and local contractors (the "contractor team") joined together to prepare a proposal for completing Phase I with a large-bore tunnel through Tysons Corner. This contractor team included Dragados, Lane Construction Corporation, Aldridge, Arup, Dr. Sauer Group, and others.

95.     On July 31, 2006, the contractor team submitted a proposal to the Governor of Virginia for construction of Phase I of the Project, with a large-bore tunnel in the Tysons Corner Segment, for "a project cost within a $2 billion budget." At that time, the latest available cost estimate from DTP for Phase I (with the aerial design) was $2.38 billion. This proposal would

have allowed the construction of all of Phase I, with a tunnel, for substantially *less* than DTP's cost estimate for the Project with the aerial design.

96.    USDOT knew or should have known of this proposal. Despite the availability of this additional information showing that the cost of constructing the tunnel could be less than construction the aerial option, USDOT did not reconsider its earlier decision to dismiss the tunnel alternative.

97.    The information presented by Dragados, the contractor team, WMATA and the ASCE panel directly contradicted the earlier conclusions that the tunnel option was more expensive than the aerial alternative and that there was a greater risk of construction cost escalation due to underground construction. This information also contradicted the conclusion that the impacts of the aerial alternative could be mitigated. The information further confirmed the fact that the tunnel alterative would have fewer impacts than the aerial alternative.

98.    Nonetheless, USDOT did not reevaluate its previous analysis of a tunnel alternative, nor did it provide any opportunity for additional public review and comment on the tunnel alternative.

### The Amended Record Of Decision

99.    On November 17, 2006, USDOT issued an Amended Record of Decision approving the NEPA documentation for the Project and determining that there were no prudent and feasible alternatives with fewer environmental impacts to the aerial alterantive under 49 U.S.C. § 5324.

100.    The EA and Amended Record of Decision included no new analysis of tunnel alternatives despite the availability of information contradicting the earlier conclusions that the tunnel would be more expensive and subject to higher cost escalation risks, and despite the

availability of information demonstrating that the tunnel was a reasonable alternative that was feasible and practicable, and would impose fewer impacts than the aerial alterative.

101.    USDOT issued the Amended Record of Decision without taking that information into account or performing any independent analysis of whether the large-bore tunnel option was a reasonable alternative. Instead, USDOT relied completely upon VDRPT's assessment of the tunnel.

### USDOT's Refusal To Reconsider The Amended Record Of Decision

102.    On March 26, 2007, Plaintiffs submitted a petition to USDOT pursuant to 5 U.S.C. § 555(b) requesting (1) that USDOT reopen the NEPA process to reconsider its earlier rejection of the tunnel alternative, (2) that USDOT determine that the sole-source procurement of the design build contract with DTP was inconsistent with federal statutory competitive procurement standards, and (3) ensure that a competitive bidding process is implemented for the design-build contract. On May 3, 2007, Plaintiff Tysons Tunnel supplemented the Petition with additional information.

103.    As supplemented, the Petition presented to USDOT detailed information demonstrating the viability and cost-effectiveness of the tunnel alternative using the large-bore tunneling method. The Petition also presented USDOT with the details of the various proposals by Dragados, Siemens and others to build the tunnel at a cost equal to or less than the cost of the aerial alternative.

104.    On May 23, 2007, USDOT denied the Petition, citing three grounds.

105.    First, USDOT stated that a separate proceeding under Section 555 would "contradict both the fundamental principles of local decision making in the Major Capital Investments (New Starts) process and the several prescribed opportunities for public

participation in the development of a project . . . ." USDOT further stated that a proceeding under Section 555(b) would "impair" FTA's ability to manage other projects in its "pipeline."

106.    Second, FTA stated that it had "conducted a through review of the data and information [the Plaintiff] and other parties have provided on large bore tunneling. Very recently, FTA determined that the data does not affect the agency's environmental review of the project, which was concluded with an amended Record of Decision on December 17, 2006. Thus, at this time, there is no need to supplement the environmental impact statement for the [Project]."

107.    Third, USDOT concluded that Plaintiff Tyson Tunnel could not raise issues related to the sole-source procurement process for the design-build contract because USDOT regulations "allow State recipients of USDOT funds to conduct procurements in accordance with State policies and procedures" and that the Plaintiff had not challenged the procurement process under State law. USDOT also recognized, however, that there was no State procedure for the Plaintiff to pursue to raise its objections.

### Additional USDOT Decisionmaking Regarding the Project

108.    On information and belief, USDOT has initiated an internal review regarding the Project, believed to be focused on whether the award of the design-build contract to DTP complied with federal competitive procurement requirements.

109.    The New Starts approval process is ongoing. The most recent approval in this process occurred on June 10, 2004, when USDOT approved the Project's entry into preliminary engineering. On information and belief, the next approval point in this process will be approval

to enter final design. Any decision to authorize entry into final design is a separate agency action from the decisions contained in the Amended ROD.

110.    On July 27, 2007, the FTA issued its Baseline Report on Major Project Monitoring of the Dulles Corridor Metrorail Project ("Baseline Report")

111.    The Baseline Report confirmed, among other things, that there was no competition for the design build contract.

### COUNT I - PURSUANT TO THE ADMINISTRATIVE PROCEDURES ACT FOR VIOLATION OF NEPA AND NEPA REGULATIONS: FAILURE TO RE-CONSIDER TUNNEL ALTERNATIVE AFTER ISSUING THE AMENDED RECORD OF DECISION

112.    Plaintiffs repeat and incorporate paragraphs 1 -111 above by this reference as if restated here in full.

113.    NEPA and its regulations require that USDOT prepare additional environmental analyses if there are new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. Such new circumstances or information includes information showing that a previously rejected alternative should have been, or should now be, considered a reasonable alternative and therefore carried forward for detailed review when that alternative would have fewer environmental impacts that the preferred alternative. The duty to consider new information is continuing for so long as USDOT has the ability to influence the outcome of the Project

114.    Circumstances and information USDOT was aware of, or should have been aware of, after issuance of the Amended Record of Decision, showed that a large-bore tunnel could be built through the Tysons Corner Segment at a cost equal to or less than the aerial option and with fewer environmental impacts.

115.    Circumstances and information USDOT was aware of, or should have been aware of, after issuance of the Amended Record of Decision, directly contradicted the basis on which USDOT had previously rejected the tunnel alternative.

116.    Defendants must still make additional decisions regarding the Project and may still influence the outcome of the Project.

117.    Despite these circumstances and information, USDOT failed to conduct additional environmental analysis based on that new information by reconsidering its prior rejection of the tunnel alternative and reanalyzing the tunnel alternative as a reasonable alternative.

118.    Plaintiffs will suffer irreparable harm if the relief requested herein is not granted.

119.    Plaintiffs do not have an adequate remedy at law.

120.    Plaintiffs have exhausted its administrative remedies.

121.    USDOT's failure to consider whether additional environmental analysis of the tunnel alternative is in violation of NEPA and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

## COUNT II - PURSUANT TO THE ADMINISTRATIVE PROCEDURES ACT FOR VIOLATION OF FEDERAL TRANSIT LAWS: FAILURE TO COMPLY WITH 49 U.S.C. § 5324

122.    Plaintiffs repeat and incorporate paragraphs 1 – 121 above by this reference as if restated here in full.

123.    49 U.S.C. § 5324(b) requires the Secretary of Transportation to make "written findings, after reviewing the application and any hearings held before a State or local governmental authority under section 5323(b) of this title, that . . . (iii) no adverse environmental effect is likely to result from the project, or no feasible and prudent alternative to the effect exists and all reasonable steps have been taken to minimize the effect."

124.    Construction and operation of the aerial alternative through the Tysons Corner Segment would have adverse environmental effects.

125.    USDOT has acknowledged that the tunnel alternative would have fewer environmental impacts than the aerial alternative.

126.    A tunnel is a reasonable and prudent alternative to the aerial track through the Tysons Corner Segment.

127.    USDOT failed to make written findings that there were no prudent or feasible alternatives to the aerial alternative.

128.    USDOT did not perform an adequate analysis to determine whether the tunnel alternative was a prudent and feasible alternative to the aerial option.

129.    Information USDOT knew or should have known of demonstrates that the tunnel alternative is a prudent and feasible alternative that would have fewer environmental effects than the aerial alternative.

130.    Plaintiffs will suffer irreparable harm if the relief requested herein is not granted.

131.    Plaintiffs do not have an adequate remedy at law.

132.    Plaintiffs have exhausted its administrative remedies.

133.    USDOT violated 49 U.S.C. § 5324 when it stated that there was no prudent and feasible alternative with fewer environmental impacts to the aerial alternative.

134.    USDOT's rejection of the tunnel alternative, and determination that there was no prudent and feasible alterantive with fewer environmental impacts to the aerial alternative, violated 49 U.S.C. § 5324, and is arbitrary, capricious, an abuse of discretion and otherwise contrary to law.

## COUNT III – PURSUANT TO THE ADMINISTRATIVE PROCEDURES ACT FOR VIOLATION OF 49 U.S.C. § 5325:
## FAILURE TO ENSURE COMPETITIVE AWARD OF DESIGN-BUILD CONTRACT

135.    Plaintiffs repeat and incorporate paragraphs 1 – 134 above by this reference as if restated here in full.

136.    49 U.S.C. 5325(a) requires that: "Recipients of assistance under this chapter [49 U.S.C § 5301 *et seq.*] shall conduct all procurement transactions in a manner that provides full and open competition as determined by the Secretary."

137.    FTA Circular 4220.1E applies to all grantees receiving funds from FTA. Paragraph 4(a) of the Circular provides that all grantees – even State agencies – must comply with Paragraph 8(a) of the Circular. Paragraph 8(a) states that "All procurement transactions will be conducted in a manner providing full and open competition."

138.    The USDOT competitive procurement regulations (40 C.F.R. § 18.36) and FTA Circular 4220.1E on Third-Party Contracting differentiate between State agencies and non-State agencies.

139.    The USDOT regulations are known as the "common grant rule" and apply generally to all USDOT grantees. These regulations provide that "when procuring property and services under a grant, a State will follow the same policies and procedures it uses for procurements from its non-Federal funds." 49 C.F.R. § 18.36(a). These regulations were issued prior to the enactment of 49 U.S.C. § 5325(a) and cannot be interpreted as an exception to that subsequent statutory requirement for "full and open competition."

140.    Under Paragraph 8(a) of FTA Circular 4220.1E, the requirement for "full and open competition" applies to this Project *regardless* of whether the grantee is VDRPT or MWAA, because this requirement applies to both State and non-State grantees.

141.    The competitive procurement requirement in Circular 4220.1E, which has long existed as a matter of FTA policy, was given even greater force by the enactment of the statutory requirement for competitive bidding on FTA projects in Section 3025 of SAFETEA-LU in August 2005 (now codified at 49 U.S.C. § 5325(a)).

142.    This statutory requirement places the obligation on the Secretary – and thus, indirectly, on FTA – to determine whether there has been "full and open competition" in the procurement process for a transit project. The only discretion afforded the Secretary is to specify the means by which full and open competition is to be secured.

143.    Section 5325(a) codifies a requirement that has long existed in regulations and guidance.

144.    The USDOT Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments, codified at 49 C.F.R. § 18.36, establishes a general requirement for competitive procurement on federally assisted transportation projects.

145.    FTA has established more specific requirements for transit projects in Circular 4220.1E, which states in Paragraph 8(a) that "All procurement transactions will be conducted in a manner providing full and open competition."

146.    Circular 4220.1E makes clear that "full and open competition" means meaningful consideration of multiple offers. It does not mean sole-source awards, and the use of sole-source procurement practices is limited to narrow circumstances not present here.

147.    In Circular 4220.1E, FTA notes that as a general matter, it relies on grantees to certify compliance with FTA's third-party contracting requirements, rather than exercising a federal approval role for each third-party contract. However, when FTA receives information demonstrating that a project is not following the competitive-procurement requirement, FTA has

a duty – given the clear mandate of 49 U.S.C. § 5325(a) – to take affirmative steps within its authority to ensure full and open competition.  To grant further authorizations for the Project, without ensuring competitive procurement, would be arbitrary and capricious and in violation of 49 U.S.C. § 5325(a).

148.    Therefore, under both 49 U.S.C. § 5325(a) and FTA Circular 4220.1E, all FTA grantees – even State agencies such as VDRPT – must comply with the requirement for "full and open competition" in third-party procurements.

149.    MWAA and VDRPT negotiated the design-build contract on a sole-source basis without providing full and open competition.

150.    The design-build contract does not qualify for any exception to the full and open competition requirement.

151.    USDOT arbitrarily and capriciously, and otherwise not in accordance with law, approved the use of federal grant funds to pay for the Project even though the procurement of the Design-Build Contract was not conducted with full and open competition.

## DEMAND FOR RELIEF

152.    Enter judgment for Plaintiffs and against Defendants on all Counts asserted in this Complaint.

153.    Declare that Defendants have violated the National Environmental Policy Act, the Administrative Procedure Act and 49 U.S.C. § 5324 by:

154.    Failing to analyze the tunnel alternative through the Tysons Corner Segment as a reasonable alternative in the NEPA process; and

155.    Determining that there were no prudent and feasible alternatives with fewer environmental impacts to the aerial alternative through the Tysons Corner Segment.

156.    Remand this matter to USDOT to:

USADMIN 9276282.1

157.   Reopen the NEPA process to analyze the tunnel alternative as a reasonable alternative;

158.   Analyze and make written findings as to whether the tunnel alternative is a prudent and feasible alternatives with fewer environmental impacts to the aerial alternative as required by 49 U.S.C. § 5324;

159.   Enjoin Defendants taking final actions, granting any federal approvals, including acting on any application for the Project to enter Final Design or for Full Funding Grant Agreement, or awarding or allocating any federal funds until Defendants have complied with NEPA and 49 U.S.C. § 5324 as described above.

160.   Grant such other relief as the Court deems just and proper.

161.   Award Plaintiffs their costs of suit, including reasonable attorneys fees.


Respectfully submitted.


Stephen E. Baskin (VA. Bar No. 47567)
KILPATRICK STOCKTON, LLP
607 14th Street, NW, Suite 900
Washington, DC  20005
Telephone:  (202) 508-5800
Facsimile:  (202) 508-5858

Of Counsel:

Gary H. Baise (D.C. Bar No. 194878)

Attorneys for Plaintiffs Tysons Tunnel, Inc. and
Ratner Companies, LC

November 26, 2007

30